33 C.C.P.A.(Patents)

### Application of GOLDSBY.
### Patent Appeal No. 5118.

Court of Customs and Patent Appeals.
April 1, 1946.

R. J. Dearborn and W. P. Epperson, both of New York City (Daniel Stryker, of New York City, of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the examiner rejecting five claims, numbered 7 to 11, inclusive, embraced in appellant's application, serial No. 464,351, for reissue of a patent No. 2,271,860 relating to method of treating hydrocarbons, "particularly," as recited in the specification, "with the alkylation of paraffin hydrocarbons with olefins."

The several claims, six in number, embraced in the patent which was issued February 3, 1942, upon an application filed February 17, 1938, stand allowed in the reissue application, but those on appeal were rejected on the grounds, as epitomized in the brief of the Solicitor for the Patent Office, that (1) they are not supported by the disclosure of the reissue application and that (2) they are not for the same invention as the claims of the patent sought to be reissued.

It appears that appealed claims 7, 8, 9, and 10 were copied literally for interference purposes from a patent, No. 2,293,705, issued to one Herman S. Bloch, August 25, 1942, upon an application filed July 31, 1940, and that appealed claim 11, also presented for interference purposes, was "patterned after" claim 1 of the Bloch patent, being modified to omit certain features of the latter claim.

Claims 7, 10, and 11 read as follows:

"7. A process for producing more valuable products from normal butane and olefins, which comprises subjecting said normal butane to a purifying treatment in the presence of concentrated sulfuric acid, separating the purified normal butane from the used sulfuric acid, subjecting the purified normal butane to catalytic isomerization to form isobutane, separating the isobutane from unconverted normal butane, and alkylating said isobutane with olefins in the presence of a catalyst comprising at least a portion of the used sulfuric acid."

"10. A process for producing more valuable products from normal butane and olefins, which comprises subjecting said normal butane to a purifying treatment in the presence of concentrated sulfuric acid, separating the purified normal butane from the used sulfuric acid, subjecting the purified normal butane to catalytic isomerization to form isobutane, and alkylating the resultant isobutane with olefins in the presence of a catalyst comprising at least a portion of the used sulfuric acid."

"11. A process for the production of a motor fuel of high anti-knock value which comprises subjecting a charging stock containing normal butane to the action of concentrated sulfuric acid, separating the acid and the treated normal butane, subjecting said normal butane to contact with aluminum chloride and hydrogen chloride to effect isomerization of a substantial portion of the normal butane to isobutane, separating the products from the isomerization step into residual gases, normal butane and isobutane, commingling said isobutane with olefin-containing charging stock and with isobutane recycle stock obtained from an alkylation reaction in a manner hereinafter described, subjecting said mixture to the action of used sulfuric acid from the normal butane treating operation under alkylating conditions to alkylate the isobutane with the olefin to form a hydrocarbon alkymer material suitable for use as a motor fuel, separating the acid and hydrocarbon products, fractionating said hydrocarbon products to separate excess isobutane, normal butane and alkymer, and recycling said isobutane to the alkylation reaction where it is commingled with the isobutane formed in the isomerization step and the olefin-containing charging stock as hereinbefore set forth."

The several appealed claims were analyzed in the statement of the examiner as follows:

"Claim 10 is the broadest of the appealed claims. It calls for subjecting normal butane to a purifying treatment in the presence of concentrated sulfuric acid (zone 3 of Bloch), separating the purified normal butane from the used sulfuric acid (separator 5 and lines 8 and 6, respectively, of Bloch), subjecting the purified normal butane to catalytic isomerization to form isobutane (zone 10 of Bloch), and alkylating the resultant isobutane with olefins in the

presence of a catalyst comprising at least a portion of the used sulfuric acid (zone 17, olefins through line 16 and acid through lines 6 and 7 of Bloch).

"Claim 8 is substantially for the same process as claim 10 with the additional step of separating unconverted normal butane after the isomerization and before the alkylation. The alkylation is said to be in the presence of the used sulfuric acid.

"Claim 9 is a duplicate of claim 8 plus the limitation that the alkylation is in the presence of the used sulfuric acid and additional fresh sulfuric acid.

"Claim 7 is the same as claim 8 except that claim 7 states the alkylation catalyst as comprising at least a portion of the used sulfuric acid.

"Claim 11 is more specific than claims 7 to 10. Claim 11 is specific to the isomerization catalyst, stating it to be aluminum chloride and hydrogen chloride. Claim 11 states that the isomerization products are separated into residual gases, normal butane and isobutane and that said isobutane together with isobutane recycled from the alkylation is subjected to the alkylation. According to this claim, the alkylation products are separated into acid and hydrocarbons, the latter are fractionated to separate excess isobutane, normal butane and alkymer, and the isobutane is recycled to the alkylation."

While the case involves subject matter of a technical nature and is somewhat complicated, nevertheless, after a careful study of the various elements involved, the issues seem clear and not difficult of determination.

Appellant's application embraces a drawing depicting an apparatus for carrying out the process described in the specification and defined in the claims which were allowed him in his patent reissue of which is sought. The operation is described in considerable detail in the decisions of the tribunals of the Patent Office, particularly in the statement of the examiner. The operation of the Bloch process as disclosed in his specification and defined in the claims which appellant copied for interference purposes is likewise described. Appellant's brief also describes both in detail.

It was pointed out by the examiner that the appealed claims require "three separate and distinct steps. * * * [1] the purification of normal butane in the presence of concentrated sulfuric acid, [2] the isomeri-zation of the purified normal butane, and [3] the alkylation with olefins of isobutane produced by the isomerization in the presence of used sulfuric acid from the purification step," and it was held, in effect, that appellant had no conception of practicing three steps and disclosed only two steps.

To state the matter somewhat differently, it was held, in effect, that in the process disclosed by appellant the purification step and the alkylation step take place *in the same reaction chamber and at the same time*.

The following taken from the examiner's statement is clarifying:

"If it is granted that the alkylation step of Goldsby is a normal butane purification, then the isomerization of the purified normal butane takes place in the Goldsby zone 36 and the mixture of normal and isobutane from the isomerization products is passed by Goldsby's line 53 into the alkylation zone 3. The same zone that must be called the purification zone must now be considered the alkylation zone and these two operations, in order to respond to the claims, must be considered as taking place at two distinct and separate intervals of time. Moreover, we must go even farther. The claims call for using the used sulfuric acid from the purification as the alkylation catalyst. In Goldsby's alkylation, the acid is separated in separator 18 from alkylation products and the acid is recycled by line 20 to the alkylation zone. To meet the claims this recycled acid must be termed used acid from the purification step. The question is when is it used alkylation acid and when is it used purification acid? The same question arises with respect to the acid in the alkylation zone 3. When does it purify and when does it alkylate?"

The foregoing seems to apply particularly to claims 7 to 10.

With respect to claim 11, the examiner said:

"* * * [It] calls for separating the isomerization products into residual gases, normal butane and isobutane. The claim does not call for separating the products into residual gases as one fraction and normal and isobutane as a second fraction. The claim calls for three fractions according to the punctuation thereof and as supported in Bloch whereas Goldsby discloses the separation of both butanes as a single fraction and the sending of the mixture by line 53 to the alkylation. As called for by claim 11 and as supported by Bloch only said isobutane without the normal butane goes to the

alkylation. The normal butane present in the alkylation of Bloch is that which may accompany the olefins-containing charge.

"Applicant's invention is for a process wherein a mixture of normal butane, isobutane, and olefins, each in substantial amount, is subjected to an alkylation in the presence of concentrated sulfuric acid, the used acid is separated and recycled, and the normal butane is subjected to isomerization to isobutane which is passed to the alkylation. Bloch discloses and claims an entirely different process. According to his process, normal butane which contains no isobutane and may contain olefins only in small impurity proportions is treated with concentrated sulfuric acid to purify the normal butane so that the impurities thereof will not act to reduce the life of the isomerization catalyst. No alkylation takes place in the purification step since the reactants therefor are not present. In applicant's case, the alkylation step must be used twice at spaced intervals of time in order to read the copied claims upon applicant's disclosure. This is unwarranted and, therefore, the copied claims are unsupported and the inventions involved herein and that of the Bloch claims are different."

Appellant does not claim that he discloses a three-step process in which each step is separate from and independent of the other. In fact his brief states that he "conducts his alkylation reaction and his normal butane treating in the same reaction chambers 3, 12," but adds "the two different process steps of alkylation and normal butane purification nevertheless are accomplished."

This appears to amount to a claim that by his two-step process appellant *obtains the same result* as that obtained by Bloch in the three-step process, and it seems to be the gist of appellant's contention that the tribunals of the Patent Office erred in giving to the claims an interpretation which required that the purification step and the alkylation step must be carried out independently of each other and in separate reaction chambers.

Appellant urges that the appealed claims "are devoid of express limitations requir-

ing them to be so construed"; that they "are free from ambiguity"; that they "should be given the broadest interpretation which they will reasonably support, and their scope should not be restricted beyond the fair and ordinary meaning of the language employed"; that by the construction given them "unexpressed limitations" were read into them (it being intimated that this was done to avoid a declaration of interference), and that the board erred in not finding "necessary inherency" in appellant's disclosure.

All the foregoing points are covered by appellant's reasons of appeal, and are discussed at length in his brief before us, the discussion being supplemented by oral argument at the hearing. The arguments have been fully considered but we do not deem it necessary to respond to them in detail.

Appellant's contentions do not seem to be entirely consistent with each other.

We do not discern wherein the tribunals of the Patent Office read any "unexpressed limitations" into the claims. Upon the contrary, they definitely pointed out limitations which established a "three-step" process and properly recognized and regarded such limitations. They also definitely, and we think properly, pointed out that appellant disclosed only a two-step process. It seems to us that instead of reading limitations into the claims *by construction* they properly refused to read into them *by construction* limitations contended for by appellant.

It may be assumed that the product resulting from the practice of appellant's two-step process is as good as, or identical in character with, that resulting from the three-step process defined in the claims, but no product claims are involved here. The claims are for the process by which the product is produced. So, we regard the allegation respecting "necessary inherency" made by counsel for appellant as being without merit. A three-step process is not necessarily inherent in a two-step process.

The decision of the board is affirmed.

Affirmed.